IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| LISA MATTHEWS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:04cv610-T |
| | ) | (WO) |
| CUMULUS BROADCASTING, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PRE-TRIAL HEARING

A pretrial hearing was held in this case on April 20, 2005, wherein, or as a

result of which, the following proceedings were held and action taken:

1. **Parties and Trial Counsel.**

   a.    Plaintiff Lisa Matthews will be represented at trial by Andy Nelms

   and Jay Lewis, Law Offices of Jay Lewis, LLC, of Montgomery,

   Alabama.

   b.    Defendant Cumulus Broadcasting, Inc. Stephen E. Whitehead, Jenna

   M. Bedsole and Rachel E. VanNortwick

   LLOYD, GRAY & WHITEHEAD, P.C., of Birmingham, Alabama.

   **Counsel Appearing at Pre-trial Hearing.**

   a.    Appearing for the Plaintiff: Andy Nelms and Jay Lewis.

b.      Appearing for the Defendant: Jenna M. Bedsole and Rachel E.

VanNortwick.

2.      **Jurisdiction and Venue.**   Jurisdiction and venue are admitted.  Plaintiff

filed his Complaint under 28 U.S.C. §1331 and §1343 to obtain

compensatory and punitive damages as well as such equitable relief as may

be appropriate.  Venue is proper in the United States District Court for the

Middle District of Alabama, in that the events giving rise to these claims

took place in the Northern Division of the Middle District of Alabama.

3.      **Pleadings.**   The following pleadings have been allowed: Complaint on

behalf of the Plaintiff; Answer to Complaint on behalf of the Defendant,

Motion for Summary Judgment, Opposition to Motion for Summary

Judgment and associated pleadings.

4.      **Contentions of the Parties.**

a.      **The plaintiff:**

1.      Plaintiff is a female citizen who had been employed by the

Cumulus Broadcasting, Inc. ("Cumulus") since April, 1996.

2

2.      Plaintiff avers that Cumulus acted to deny Plaintiff her rights under the laws of the United States of America and the State of Alabama and such action was designed to harass and to discriminate against Plaintiff, a female, because of her sex.

3.      Plaintiff would hereby make the following contentions:

4.      Plaintiff complained about his having been harassed by fellow employee and supervisor Donald Parden, and he filed a grievance about that denial.

5.      At the time of his grievance, Plaintiff began suffering retaliation in the form of sales accounts being taken away and sales commissions where reduced.

6.      Plaintiff contends that during her employment she was subjected to sexual harassment in that she was subjected to unwelcome verbal conduct of a sexual nature perpetrated against her by a male co-worker; Parden.

7.      Plaintiff contends that the harassment complained of was based upon her sex in that, but for the fact of her sex, Plaintiff would not have been the object of harassment.

3

8.      Plaintiff contends that the harassment affected a term, condition, or privilege of her employment.

9.      Plaintiff contends that the harassment complained of was so sufficiently pervasive that it unreasonably interfered with Plaintiff's ability to perform and enjoy her job and created an intimidating, hostile and/or offensive work environment.  Due to the harassment, Plaintiff was forced to terminate her employment with the defendant.

10.     Plaintiff contends that the defendant is directly liable for the harassment complained of in that the defendant knew or should have known about the harassment in question and failed to take prompt remedial action to remedy the situation.

11.     Plaintiff contends that she perceived the environment to be hostile and abusive and further that a reasonable person would find the environment to be hostile and abusive.

12.     Plaintiff contends that the conduct complained of directly and proximately caused her to suffer severe and extreme emotional distress.

13.   Plaintiff contends that the conduct complained of was so outrageous and extreme that it went beyond all possible bounds of decency and was atrocious and utterly intolerable in a civilized society.

14.   Plaintiff contends that no reasonable person could be expected to endure the harassment for the sake of maintaining employment.

15.   Plaintiff contends that the conduct of the perpetrator, Parden, was intentionally carried out and that the defendant, by and through its management, willfully or wantonly caused Plaintiff to suffer emotional distress by failing to take prompt remedial action after notice.

16.   Plaintiff contends that the male perpetrator, Parden, knew or should have known that the conduct complained of was likely to cause Plaintiff severe emotional distress.

17.   Plaintiff contends that the defendant knew or should have known that by not taking prompt remedial action to remedy the

outrageous conduct of its employee that severe emotional distress would likely result.

18.   Plaintiff contends that the defendant, by and through its management, willfully or wantonly caused Plaintiff to be constructively discharged by failing to respond, investigate, protect or take timely and appropriate action in response to the extreme and outrageous conduct of a sexual nature, when it in fact knew about the conduct.

19.   Plaintiff contends that the defendant's employee intentionally intruded upon the solitude and seclusion of Plaintiff's private affairs or concerns by badgering her on the job in front of customers and employees regarding conduct of a sexual and private nature.

20.   Plaintiff contends that the intrusion was highly offensive and would be highly offensive to a reasonable person.

21.   Plaintiff contends the intrusion into her private affairs was wrongful and done in such a manner so as to outrage and cause mental suffering, shame and humiliation.  Plaintiff

further contends that said activities would have outraged and

caused mental suffering, shame and humiliation to persons of

ordinary sensibilities.

22.     Plaintiff contends that as a result of the intrusion she was

direct and proximately caused to suffer severe emotional

distress and mental anguish.

23.     Plaintiff contends that the defendant is liable for the employee's

conduct as alleged in the state law claims.  Plaintiff contends

that the defendant is liable for the male employee's intentional

torts because the defendant had knowledge of the tortious

conduct aimed at Plaintiff and that based upon this knowledge

the defendant knew or should have known that such conduct

was unlawful and failed to take adequate steps to remedy the

situation.

24.     Plaintiff contends that as a direct and proximate result of the

unlawful actions taken against her she has been caused to

suffer damages from then until now.

25.    Plaintiff has been damaged in that she has been denied

continuing employment and has been denied pay, title, prestige

and status.  In addition, she has been denied an opportunity to

maintain her employment  in which she would have

opportunity for future advancement and pay increases.

Plaintiff also has suffered emotional distress, mental anguish,

embarrassment, humiliation, and a loss of enjoyment of life.

Plaintiff has been compelled to seek mental health treatment as

a result of the treatment she was accorded.

26.    In light of the foregoing, Plaintiff has made out a *prima facie*

case of sexual harassment under Title VII in that Plaintiff

engaged in statutorily protected activity when she opposed

employment practices she believed to have been made unlawful

by federal law, to wit: Plaintiff made complaint to her employer

as proscribed by her employee handbook and via the policy and

procedure give her by her employer.  Her employer either

refused or neglected to take remedial action to stop the sexual

harassment.  Plaintiff was injured thereby in that she suffered a reduced income and ultimately was constructively discharged.

27. Plaintiff is entitled to recover $300,000.00 in compensatory damages as to her claim under Title VII.

28. In the alternative, Plaintiff is entitled to recover nominal damages.

29. Plaintiff is entitled to be awarded the costs incurred in connection with this litigation and reasonable attorneys' fees.

30. Further, Plaintiff contends that she is entitled to equitable relief including back pay and instatement or, in lieu of instatement a reasonable sum of money by way of front pay.

**b. The Defendant:**

1. As a matter of law, Ms. Matthews cannot prove her claim of sexually hostile work environment.

2. Ms. Matthews suffered no tangible employment action and thus Cumulus is not strictly liable for any alleged hostile work environment.

3.      Ms. Matthews cannot prove the existence of a hostile work environment.

4.      Ms. Matthews cannot demonstrate the comments were physically threatening or humiliating.

5.      The alleged incidents of sexual harassment did not unreasonably interfere with Ms. Matthews' employment.

6.      As Ms. Matthews participated in the alleged "undesirable conduct," she cannot establish the conduct was "unwelcome."

7.      Ms. Matthews was not constructively discharged.

8.      As a matter of law, Cumulus cannot be liable for unreported acts of sexual harassment.

9.      As a matter of law, Ms. Matthews cannot sustain a state law claim for invasion of privacy.

10.     As a matter of law, Ms. Matthews cannot establish a state law claim for outrage.

11.     Cumulus cannot be held vicariously liable for the acts of Don Parden.

12.     Cumulus denies Plaintiff is entitled to any relief as alleged.

5.    **STIPULATIONS OF FACT BY AND BETWEEN THE PARTIES:**

The pertinent facts in this matter remain in dispute, however, the parties have engaged in communications regarding stipulation submitting the following:

1.    Lisa Matthews began her employment with Colonial Broadcasting in 1996 as a sales representative.

2.    As a sales representative, Ms. Matthews' duties included selling advertising for WLWI and WMXS radio stations.

3.    In 1998, Colonial Broadcasting was purchased by Cumulus Broadcasting.

On December 8, 1998, Ms. Matthews was promoted to sales manager.

4.    As sales manager, Ms. Matthews was required to oversee the daily activities of the sales department.  At the time, Jane Ray, Cheryl Woodward, Trisha Ferguson, and Billy Jones served as sales representatives.

5.    On June 26, 1999, Bernie Barker sent an email to Ms. Matthews thanking her for her hard work.  He also indicated he would increase her compensation package which he did.

6.    At the time Ms. Matthews served as sales manager, Terry Barber served as Director of Sales and was her direct supervisor.  Bernie Barker served as Marketing Manager and was Terry Barber's direct supervisor.

7.    On November 1, 1999, Terry Barber congratulated Ms. Matthews on her October for WLWI and MIX.  In the same memorandum, Mr. Barber stressed his concern over the other salespersons who did not hit their goals. In closing, he added "[l]et's not make the mistake now of [not] continuing to develop as much new local business as possible."

8.    In January of 2001, Ms. Matthews came to Bernie Barker and requested to return to the sales department as a sales representative.

9.    Ms. Matthews requested the demotion because she had a small child with whom she wanted to spend more time – as a sales manager she was going in to the office early and staying late.  She was also making less money.

10.    Bernie Barker replied that he understood and asked Ms. Matthews to remain in the position until he found a replacement.

11.    Ms. Matthews first met Mr. Parden in April of 2001 when he was hired as a general sales manager for Cumulus.

12.     On April 24, 2001, Ms. Matthews returned to her former position as

sales account representative.

13.     When Ms. Matthews returned to the sales account representative

position, Bernie Barker, the market manager, assigned the house accounts

to her.

14.     House accounts are accounts typically worked by the sales manager.

No commission is paid to a sales account representative on a house

account.  The market manager and sales manager determine which

accounts are house accounts.

15.     Any accounts worked by the sales representatives are not the sales

representatives' accounts; the accounts can be moved among different

sales representatives.

16.     Although Ms. Matthews received both local and regional accounts

from Mr. Barker, the majority of her accounts were regional.

17.     Specifically, Bernie Barker assigned an abnormal amount of regional

accounts to Ms. Matthews when she returned to the sales account

representative position to give Ms. Matthews some time to develop her local

accounts.

18.     On January 2, 2002, Don Parden issued a memorandum to Ms. Matthews indicating she would have to increase her local accounts. Specifically, he noted her clients were over 80% in regional business.

19.     In the memorandum, Mr. Parden indicated he and the other sales manager, Richard Behr would handle all of the regional accounts. Specifically, Mr. Parden was to assume eighteen of Ms. Matthew's regional accounts as of January and an additional two accounts he would move in March.

20.     Previously, Mr. Parden had talked to Ms. Matthews about increasing the number of local accounts handled by the sales account representatives.

21.     Although Mr. Parden moved the majority of Ms. Matthews' regional accounts, she retained some of them.  Other sales representatives had some regional accounts as well.

22.     Richard Behr was the sales manager for WXFX and WHHY.  Ms. Matthews believed Richard Behr took some of the regional accounts from Sam Gurley, a sales representative for WXFX and WHHY.

23.     When Mr. Parden gave Ms. Matthews the memorandum, he said to her "I don't want this to scare you.  I'm not going to put this in your file.

Bernie will never see this, and I did not send a copy to Mark. This is just to scare you. I want you to focus more on local business."

24.    After Mr. Parden made the comments and gave her the memorandum, Ms. Matthews went to Bernie Barker. Mr. Barker returned a couple of the regional accounts to her.

25.    Ms. Matthews contends when Mr. Parden first arrived at Cumulus Broadcasting, he asked to take Ms. Matthews and her daughter to dinner at Chuck E. Cheese.

26.    Ms. Matthews laughed at his request and Mr. Parden said he was new in town and did not know anyone. He stated he would really like to take Ms. Matthews and her daughter out to eat. Ms. Matthews replied she did not think it would be a good idea and they needed to keep it on a business level.

27.    Ms. Matthews contends Mr. Parden began taking her accounts not long after their conversation.

28.    Ms. Matthews testified she went to Mr. Barker to complain about her regional accounts being taken from her. Mr. Barker asked whether she thought she had a target on her back and Ms. Matthews replied she thought

she did.  When Mr. Barker asked why she thought that she replied, "I don't know if it's because he asked me out and I told him no or don't know if it's because I'm a female that used to hold his position.  But he has got it in for me."

29.    Ms. Matthews went into Mr. Barker's office to talk about Mr. Parden four or five times.

30.    Each time Ms. Matthews went into Mr. Barker's office she was crying uncontrollably because of Mr. Parden's general treatment of her and because accounts were taken from her.

31.    She would tell Mr. Barker about the way Mr. Parden spoke to her.

32.    At the time, Jane Ray, Cheryl Woodward, Calvin Cherry, Brent Markwell and Dale Sexton served as account sales representatives along with Ms. Matthews.

33.    In late July of 2002, all sales account representatives were informed Cumulus Broadcasting in Montgomery planned to hire a regional salesperson. The matter was discussed in sales meetings and in one-on-one meetings.

34.   On July 2, 2002, Don Parden sent an email to all of the sales representatives thanking everyone for their outstanding efforts over the past several months.

35.   Don Parden and Mr. Barker determined it would be equally cost effective to permit the sales account representatives to keep some of their regional business but at a reduced commission rate.

36.   The commission rate structure was decreased from 10% to 5% on all regional accounts and was effective as of January 1, 2003.

37.   In October of 2002, all sales account representatives signed the agreement outlining the change in commission structure.

38.   Ms. Matthews signed an amendment modifying her compensation plan.  The amendment confirmed "[e]ffective January 1, 2003, the commission rate paid on sales to agencies located outside the Montgomery Metro Area is changed as follows: FROM 10% to 5% on net sales."

39.   In sales meetings and in individual conferences, Ms. Matthews as well as the other sales account representatives were counseled about the need to add additional business to offset the impending change in commission.  The same commission rate structure is currently in place.

40.  Ms. Matthews assumed the reason for the decrease in commission rates was an effort to encourage the sales representatives to sell more locally.

41.  On February 12, 2003, Ms. Matthews tendered her resignation. She indicated she would continue working through the beginning of March of 2003.

42.  Donna Headley, Cumulus's general sales manager for Y102 and the Fox staff asked Ms. Matthews if she was sure she wanted to leave and stated Cumulus would hate to lose her.

43.  Ms. Matthews replied she already made a commitment to the McKey Group, her future employer.

44.  Towards the middle or end of February of 2003, Cumulus Broadcasting terminated Mr. Parden's employment.

45.  When Mr. Parden informed the sales department he was terminated, Ms. Matthews was still working for Cumulus at the time.

46.  After Ms. Matthews learned Mr. Parden had been terminated, she never rescinded her resignation.

47.  Cumulus Broadcasting's unlawful harassment policy provides:

Any employee who feels that he or she is a victim of harassment on sexual or other grounds should immediately report the matter to the General Manager. Rhonda DeVoe may guide the General Manager's investigation and response in the Chicago headquarters. If the General Manager is the subject of a complaint, the report should be made directly to Rhonda DeVoe in the Chicago headquarters.

48. On February 8, 2001, Ms. Matthews acknowledged receipt of Cumulus Broadcasting's Harassment Policy.

49. After Mr. Parden asked Ms. Matthews and her daughter to have dinner with him at Chuck E. Cheese, he never asked her out again.

50. Mr. Parden never asked Ms. Matthews to have sex with him.

51. Mr. Parden never asked Ms. Matthews about her sex life.

52. Ms. Matthews never heard Mr. Parden ask another woman who worked in the office out for a date.

53. Mr. Parden never made any passes or advances towards Ms. Matthews.

54. Mr. Parden never tried to kiss Ms. Matthews.

55. Ms. Matthews admitted saying "fuck" in the workplace.

56. While at the office, Ms. Matthews discussed her sexual partners and her sex life with co-workers.

57. No one at Cumulus ever told Ms. Matthews she was fired or terminated.

58. Donald Parden has never been served in this matter, the Court does not have personal jurisdiction over Donald Parden, Donald Parden is due to be dismissed as a party.

It is ORDERED that:

(1) The jury selection and trial of this cause, which is to last two (2) days, are set for May 23, 2005, at 10:00 a.m., in Courtroom 2E, Frank M. Johnson, Jr. Courthouse Complex, One Church Street, Montgomery, Alabama;

(2) The parties are to file their pre-trial briefs, proposed jury selection questions, and proposed jury instructions by May 18, 2005;

(3) Each party shall have available at the time of trial, for use by the court (the judge, the courtroom deputy clerk, and the law clerk),

three copies of the list of his or her
exhibits;

(4)   At least three days before trial, counsel are
to contact the courtroom deputy clerk about
the procedures for pre-marking all trial
exhibits;

(5)   Each party shall have available a sufficient
number of copies of each photostatically
reproducible exhibit for each of the jurors,
opposing counsel, the courtroom deputy clerk,
the law clerk, and the judge; and

(6)   All understandings, agreements, and
stipulations contained in this pretrial order
shall be binding on all parties unless an
objection is noted and filed with the court
within seven (7) days from the date of this
order.

DONE, this the 20th day of April, 2005.


____/s/ Myron H. Thompson____
UNITED STATES DISTRICT JUDGE